No. 22-12518-BB

United States Court of Appeals
*for the*
Eleventh Circuit

———————————————

BAER'S FURNITURE COMPANY, INC.,

*Plaintiff-Appellant,*

– v. –

COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC.,

*Defendant-Appellee.*

_____

**APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
HONORABLE AILEEN M. CANNON, U.S. DISTRICT JUDGE**

**PRINCIPAL BRIEF OF APPELLANT**

CARLOS M. SIRES
COREY P. GRAY
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd. Suite 1200
Fort Lauderdale, FL 33301
Tel:  (954) 356-0011
Fax: (954) 356-0022

*Attorneys for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT
## AND CERTIFICATE OF INTERESTED PERSONS

In compliance with 11th Cir. R. 26.1-1, the undersigned certifies that the following is a complete list of all trial judge(s), attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case or appeal, and includes subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held company that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

### District Court Judges

1. The Honorable Aileen M. Cannon, U.S. District Court Judge

2. The Honorable Patrick M. Hunt, U.S. Magistrate Judge

### Plaintiff/Appellant and Associated Entities

3. Baer's Furniture Co., Inc.

### Counsel for Plaintiff/Appellant

4. Boies Schiller Flexner LLP

5. Gray, Corey P., Esq., LTC USAR

6. Miller, James F., Esq.

7. Sires, Carlos M., Esq.

### Defendant/Appellee and Associated Entities

8. Comcast Cable Communications Management, LLC

9. Comcast Cable Communications, LLC

i

10.    Comcast Holdings Corporation

11.    Comcast Corporation ("CMCSA")

## **Counsel for Defendant/Appellee**

12.    Cosio, Raul J., Esq.

13.    Gamez, Anna Marie, Esq.

14.    Lada, Jennifer, Esq.

14.    Plasencia, Rebecca M. Esq.

15.    Holland & Knight LLP

# **TABLE OF CONTENTS**

**Page**

TABLE OF CITATIONS ........................................................v

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ....1

STATEMENT REGARDING ORAL ARGUMENT ..............................1

STATEMENT OF THE ISSUES.................................................1

STATEMENT OF THE CASE....................................................2

    A.    Baer's and Comcast Negotiated Separate Agreements for Separate Geographic Markets. .................................................................2

    B.    Comcast Breaches the East Coast Agreements. ..................................6

    C.    Comcast and Baer's Entered Into a New Agreement: the Shortfall Agreement. .........................................................................7

    D.    Baer's Did Not Agree the Terms and Conditions Would Apply to East Coast Agreements.................................................................10

    E.    District Court Proceedings and Disposition. .......................................12

    F.    Standard of Review. ..............................................................14

SUMMARY OF THE ARGUMENT ..................................................15

ARGUMENT ...........................................................................16

I.    THE WEST FLORIDA TERMS AND CONDITIONS DID NOT GOVERN THE PARTIES' WEST PALM BEACH AND MIAMI/FORT LAUDERDALE AGREEMENTS. ...........................................................16

    A.    There Is No Evidence In The Record That Baer's Agreed To The "Advertiser Terms and Conditions."...................................................16

    B.    There Is A Disputed Issue of Fact As To Whether the Advertiser Terms and Conditions – Even If Agreed To – Were Intended To Apply To The East Coast Agreements or the Shortfall Agreement....17

iii

C.     There Was No Meeting Of The Minds To Establish The 2017 West Florida Terms And Conditions Were Intended To Govern The East Florida Agreements. ............................................................22

D.     The Extrinsic Evidence the District Court Did Consider Supports Baer's, And Undermined Comcast's Assertions.................................23

E.     Even If the Advertiser Terms And Conditions Governed The Schedules/Insertion Orders, They Did Not Govern The Shortfall Agreement. ..........................................................................27

II.     BAER'S FORBEARANCE OF LEGAL ACTION WAS SUFFICIENT CONSIDERATION TO RENDER THE SHORTFALL AGREEMENT ENFORCEABLE....................................................................28

A.     There is a Genuine Issue of Disputed Material Fact as to Whether Baer's Forgoing Legal Action and Continuing To Do Business With Comcast Was Consideration For Comcast's Performance Under The Shortfall Agreement. ..........................................................28

B.     The Record Shows That Baer's Forewent Legal Action As Consideration For The Shortfall Agreement.......................................29

C.     Comcast Repeatedly Promised To Perform And Expressed Its Intent To Be Bound By The Shortfall Agreement........................................30

III.     BAER'S FRAUDULENT INDUCEMENT CLAIMS WERE SEPARATE AND DISTINCT FROM ITS BREACH OF CONTRACT CLAIMS.........32

CONCLUSION ........................................................................34

CERTIFICATE OF COMPLIANCE......................................................35

CERTIFICATE OF SERVICE .............................................................36

# <u>TABLE OF CITATIONS</u>

<u>Page(s)</u>

<u>Cases</u>

*ABC Liquors, Inc. v. Centimark Corp.*,
    967 So.2d 1053 (Fla. 5th DCA 2007.)....................................................23

*Aldora Aluminum & Glass Products, Inc. v. Poma Glass & Specialty Windows,*
    *Inc.*,
    683 Fed. Appx. 764 (11th Cir. 2017)........................................... 22, 23

*All Seasons Condominium Assoc. Inc. v. Patrician Hotel, LLC*,
    274 So.3d 438, (Fla. 3d DCA 2019) ............................................. 18, 19

*Ashby v. Ashby*,
    651 So.2d 246 (Fla. 4th DCA 1995)...................................................28

*Boymer v. Birmelin*,
    227 So.2d 358 (Fla. 3d D.C.A. 1969) .................................................29

*Bus. Specialists, Inc. v. Land & Sea Petroleum, Inc.*,
    25 So. 3d 693 (4th DCA 2010) ...........................................................22

*CMR Constr. & Roofing LLC v. Orchards Condo. Ass'n, Inc.*,
    220CV422FTM29MRM, 2020 WL 6273740 (M.D. Fla. Oct. 26, 2020) ..........32

*Crystal Colony Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co.*,
    6 F. Supp. 3d 1295 (S.D. Fla. 2014) ..................................................28

*Cypress Prop., LLC v. JP Morgan Chase Bank N.A.*,
    21-11989, 2022 WL 950941 (11th Cir. Mar. 30, 2022) ......................................19

*Delta Health Group Inc. v. Royal Surplus Lines Ins. Co.*,
    327 Fed. Appx. 860 (11th Cir. 2009)...................................................28

*Egyptian Nav. Co. v. Uiterwyk, 83-334 CIV-T-10*,
    1988 WL 70047 (M.D. Fla. Jan. 7, 1988).............................................29

*Evanston Ins. Co. v. Sandersville Railroad Co.*,
    761 Fed.App'x. 940 (11th Cir. 2019) ................................................14

*Flagship Resort Dev. Corp. v. Interval Intern., Inc.*,
  28 So. 3d 915 (Fla. 3d DCA 2010) ................................................................ 30, 32

*Glob. Quest, LLC v. Horizon Yachts, Inc.*,
  849 F.3d 1022 (11th Cir. 2017) ...........................................................32

*Hurt v. Leatherby Ins. Co.*,
  380 So.2d 432 (Fla. 1980)....................................................................20

*King v. Bray*,
  867 So.2d 1224 (Fla. 5th DCA 2004) ..................................................22

*Levitan v. Dancaescu*,
  2022 WL 4229388 (Fla. 1st DCA 2022) ..............................................20

*Mac-Gray Servs., Inc. v. Savannah Assocs. of Sarasota, LLC*,
  915 So. 2d 657 (2d DCA 2005) ..................................................... 19, 21

*Nichols v. Hartford Ins. Co. of the Midwest*,
  834 So. 2d 217 (1st DCA 2002) ...........................................................22

*Peterbrooke Franchising of America, LLC v. Miami Chocolates, LLC*,
  2022 WL 6635136 *(11th Cir. 2022)* ..................................... 14, 15, 17

*Riera v. Riera*,
  86 So.3d 1163 (Fla. 3d DCA 2012) .....................................................20

*Strama v. Union Fid. Life Ins. Co.*,
  793 So. 2d 1129 (Fla. 1st DCA 2001) ..................................................19

*Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*,
  904 F.3d 1197 (11th Cir. 2018) ...........................................................33

*Wilson v Flack*,
  2022 WL 4477025 (11th Cir. September 27, 2022) .............................14

*Wright & Seaton, Inc. v. Prescott*,
  420 So.2d 623 (Fla. 4th DCA 1982) ............................................. 30, 32

## **Statutes**

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 1332 ....................................................................................1

## Rules

11th Cir. R. 26.1-1 ................................................................. i

Fed. R. App. P. 32(a)(5)–(7) ...............................................35

Fed. R. App. P. 32(f) ............................................................35

Fed. R. App. P. 32(g) ...........................................................35

## Other Authorities

Restatement (Second) of Contracts § 19 (1981) ....................30

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The U.S. District Court for the Southern District of Florida exercised subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as this is an action between citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs. (D.E 38.) This Court has jurisdiction over this appeal because it is an appeal from a final judgment that disposes of all parties' claims. The District Court entered the final judgment on June 23, 2022. (D.E. 95.) Baer's timely filed its notice of appeal in the District Court on July 25, 2022. (D.E. 102.) This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would be of assistance to the Court and the parties for two reasons. First, it will allow the Court to better explore the nuanced issues of fact that were improperly decided on summary judgment. Second, it will allow discussion of the legal issues concerning the so-called "independent tort doctrine." For these reasons, Baer's requests oral argument.

## STATEMENT OF THE ISSUES

1.      Whether the District Court erred in ruling on summary judgment that Baer's and Comcast agreed upon provisions in what it refers to as the "Terms and Conditions," and in proceeding to find that those provisions governed the agreements that are the subject of this action – including the Shortfall Agreement –

1

when the record evidence established that, at the least, there exists a genuine dispute as to material facts relevant to these issues.[1]

2.    Whether the District Court erred in ruling on summary judgment that the "Shortfall Agreement" between Baer's and Comcast was not supported by consideration.

3.    Whether the independent tort doctrine barred Baer's fraudulent inducement claims that were grounded on pre-contract conduct by Comcast that induced Baer's to enter into the subject advertising agreements.

## STATEMENT OF THE CASE

### A.    Baer's and Comcast Negotiated Separate Agreements for Separate Geographic Markets.

Baer's is a family-owned Florida company, founded in 1945.  (D.E 64 ¶ 1.) Baer's offers its customers name brand furniture at competitive rates in contested local and regional markets.  (D.E. 64 ¶ 2.)  To establish and maintain its competitive advantage, Baer's has heavily relied on cable television advertising.  (D.E. 64 ¶ 4.) Baer's has always purchased cable television advertisement with the intent of targeting a precise demographic: women 35 to 64 years of age.  (D.E. ¶ 6.)  Baer's

---

[1] What Comcast (in its summary judgment motion) and the District Court (in its summary judgment order) define as "Terms and Conditions" actually consists of two separate documents.  The first is titled "Certificate of Completion."  The second is titled "Advertiser Terms and Conditions."  We treat those two documents separately, referring to each document's title, since there is no record evidence establishing a link between them.

thus purchases its television advertising based on the viewership ratings for that demographic, as measured by the ratings published by Nielsen ("Nielsen.") (D.E. ¶¶ 6–8.)

Comcast, one of the largest communications companies in the world, sells advertising to businesses through its regional marketing departments. (D.E. 38 ¶ 10); (D.E. 84 ¶ 10.) Baer's began advertising through Comcast in 2002, and did so until 2019, when Comcast's new management made clear that Comcast would not honor agreements made by prior management by way of the "Shortfall Agreement" entered into between Baer's and Comcast. (D.E. 64 ¶ 5.)

Toward the end of the calendar year, Baer's and Comcast would negotiate and enter into agreements governing the running of Baer's advertisements during the upcoming year. (D.E. 64-22, Oberholtzer Tr. 28:17–29:6.) Comcast divides its advertising divisions into different geographic regions of Florida. (D.E. 64-22, Oberholtzer Tr. 11:14–23.) The parties thus negotiated separate agreements as to the different regions of Florida. (D.E. 64-22, Oberholtzer Tr. 14:7-12.) Baer's negotiated separate agreements as to the different geographic regions; the negotiations were conducted only by employees of Comcast who were assigned to the particular geographic area and Comcast advertising division. (D.E. 75-10 ¶ 4.) Thus, Baer's negotiated different agreements with different Comcast representatives concerning different geographic markets. (D.E. 75-10 ¶ 3.)

Each agreement consists of a detailed schedule for the running of Baer's advertisements in the geographic area covered by the agreement. (D.E. 60 ¶¶ 6–10.) The schedules indicate the network on which advertising would be run; the day of the week and the time of day the advertising would be run; and the estimated Nielsen ratings points for each such date, time, and network with respect to the agreed upon demographic of women 35 to 64 years of age. (D.E. 60 ¶¶ 6–10.)

Comcast contends, and the District Court agreed, that these schedules are referred to as "Insertion Orders." (D.E. 94 at n.4) ("The terms 'schedule' and "Insertion Order" are used interchangeably in the record"). The Terms and Conditions set forth the criteria for an Insertion Order, which it defines as "IO," including specification of "the types and quantities of inventory being purchased or delivered," and "networks of [sic] distribution platforms on which the Ads will appear." (D.E. 60-1.)

Although the agreed-upon IOs identify Nielsen ratings points estimates, Comcast asserts that the agreements are not "ratings points" agreements, meaning that they do not obligate Comcast to run the advertisements during times and dates and networks having a particular viewership as measured by Nielsen ratings points. (D.E. 61.) Rather, Comcast executives testified that the ratings points were provided to Baer's so that it could take them into account in deciding which "spots" (i.e.,

network, day, and time) to purchase advertising from Comcast. (D.E. 64-22, Oberhotzer Tr. 41:09–42:19.)

Comcast designates two of its Florida geographic markets as "West Florida" and "East Florida." (D.E. 75-10 ¶ 3); (D.E. 64:1, Lieberman Tr. 102:22–103:01.) And each of those markets included what are referred to as Designated Market Areas ("DMAs"). (D.E. 64 ¶ 9.) The East Florida market, for example, includes the Miami/Ft. Lauderdale DMA and the Palm Beach DMA. (D.E. 75-10 ¶ 2.) On the other hand, the West Florida market includes, for example, Sarasota. (D.E. 75-10 ¶ 3.) The agreements that are the subject of this appeal each related to the East Florida market. None of them is related to the West Florida market.[2] The West Florida agreements were negotiated on behalf of Comcast by Fran Perpich, who was Comcast's regional account executive for the West Florida geographic area – and who was not at all involved with the agreements relating to the East Florida geographic market. (D.E. 75-10 ¶ 4.)

---

[2] Baer's also asserted that Comcast had committed fraud with respect to the separate agreement governing the Sarasota geographic area of West Florida. That claim is not subject to this appeal.

**B.    Comcast Breaches the East Coast Agreements.[3]**

In 2018, during the mid-term elections, Baer's noticed that Comcast was not running its advertising in the Miami/Ft. Lauderdale and Palm Beach County DMAs in accordance with its agreements.  Baer's thus requested that Comcast provide it with what is referred to as a "post," showing the advertisements that had actually run, the networks on which they ran, the dates and times when they were shown, and the Nielsen ratings for those dates and times for the specified demographic.  (D.E. 64 ¶ 11.)

Baer's suspicions proved correct.  Comcast had failed to run the 2018 advertisements in the Miami/Florida and Palm Beach DMAs in accordance with the agreements.  (D.E. 64 ¶ 13.)  Comcast itself calculated that it had fallen short of its obligations for the Miami/Florida DMA by an amount of 19,285 Nielsen ratings points (D.E. 64-3) and that it had fallen short of its obligations for the Palm Beach DMA by 11,341 ratings points.  (D.E. 64-4.)  As Comcast's executive wrote Baer's, "during the years of 2017 and 2018 our delivery of audience estimates has drastically under delivered." (D.E. 60 ¶¶ 21–22.) (discussing Miami/Fort Lauderdale Shortfall).

---

[3] Baer's also asserted that Comcast had committed fraud with respect to the separate agreement governing the Sarasota geographic area of West Florida.  That claim is not subject to this appeal.

**C.     Comcast and Baer's Entered Into a New Agreement: the Shortfall Agreement.**

Baer's was understandably displeased by Comcast's under-delivery of the ratings points.  (D.E. 64-1, Lieberman Tr. 54:22–55:09.)  Through its CEO, Jerome Baer, it made clear to Comcast executives tasked with resolving the issue that, unless Comcast agreed to make up for its breach of the agreements, he would resort to litigation.  (D.E. 75-03, Elberg Tr. 173:2–5.)  Comcast executive Mark Runge confirmed that "[h]e [Baer's CEO] threatened legal action if we don't do as he wishes." (D.E. 75-03, Elberg Tr. 154:25–155:14.)  In short, Baer's let Comcast know that, if it failed to take action to remedy its breaches, Baer's would sue.  *Id.*

As a result, Comcast agreed to the Shortfall Agreement.  (D.E. 75-10 ¶ 7.)  On November 15, 2018, Michael Elberg, Local Sales Manager, communicated to Baer's that "we feel it is best to make up the points in MIA and WPB before we consider adding money to Baer's in 2019," and that "once we are all squared up" Comcast would negotiate the upcoming 2019 schedule.  (D.E. 64-10.)  Approximately two weeks later, on November 27, 2018, Mr. Elberg communicated Comcast's detailed plan to make up both the 2017 and 2018 shortfalls for Miami/Ft. Lauderdale and West Palm Beach DMAs, stating, "we will be implementing the following plan," which included "[i]n 2019 *we will run* UD [under delivery] schedules in WPB and MIA that are coordinated with your advertising flight weeks," that "[a]djustments to the schedule(s) will be made to ensure performance," and that "[m]onthly posts will

7

be provided showing points achieved vs. deficit from 2018." (D.E. 64-11.) (emphasis added.) Mr. Elberg assured Baer's that "[o]ne certainty is that I will be here to ensure that the plan is implemented" and that making up Baer's ratings points shortfalls was a "top priority." (D.E. 64-12.)

On February 26, 2019, before departing Comcast, Christopher Oberholtzer, Vice President and General Manager of Comcast Spotlight Miami and the person who controlled the Miami and Fort Lauderdale marketing division, issued the following letter to Baer's acknowledging Comcast's under-delivery of points for the Miami/Ft. Lauderdale market:

> During the years of 2017 and 2018 our delivery of audience estimates has drastically under delivered. For the discussed time periods of broadcast 2017 and 2018, ***Comcast Spotlight has under delivered by 19,285 gross rating points. We will endeavor to run Baer's advertising moving forward at no charge until the audience short fall is made up.*** We understand there are many factors great and small that have contributed to this and take the matter very seriously. Again, you are a valued partner and ***we look forward making good on our shortfall*** and putting this matter behind us.

(D.E. 64-3.)

On February 28, 2019, Mr. Elberg further confirmed that Comcast underperformed in West Palm Beach ratings points by "11,341" and confirmed that West Palm Beach would "be treated just like Miami…[j]ust like the business was ordered." (D.E. 64-4.) On that same day, Christopher Oberholtzer vowed that

8

Comcast would not "shirk" its "responsibility" in making up the shortfall in ratings points.  (D.E. 64 ¶ 25.)

On March 7, 2019, Todd Weissman, the new Director of Sales for Miami and Fort Lauderdale, confirmed that Comcast was "fully committed to burning off the weight owed" and confirmed that Comcast would code Baer's make up spots as "'VIP' so that they have a much higher chance of clearing in the networks you covet, thus garnering higher ratings [i.e. points] and helping us get to a zero sum total much faster." (D.E. 64-13.)  Baer's agreed to the plan in exchange for foregoing legal action and continuing to do business with Comcast. (D.E. 75-10 ¶ 7.)

Comcast implemented and performed under the Shortfall Agreement for nearly nine months. During that time, Comcast provided regular detailed updates on the ratings points it made up for Baer's target demographic.  (D.E. 64 ¶ 17–27.)

Then, on September 16, 2019, a new Comcast executive, Mark Runge, the newly appointed Vice President of Sales for Florida, came on the scene and abruptly terminated Comcast's performance under the Shortfall Agreement.  (D.E. 64 ¶ 28.) At the time Comcast terminated the Shortfall Agreement, Comcast had made up 4,856 ratings points and 25,580 ratings points remained undelivered, which amounts to $936,040 in advertisements Baer's paid for, but Comcast never delivered. (D.E. 64 ¶ 31); (D.E. 64 ¶ 32); (D.E . 64 ¶ 35.)

Mr. Runge testified that he stopped Comcast's performance of the Shortfall Agreement only because, having come into the picture long after the agreement had been reached, he decided Comcast should never have agreed to it in the first place. He admitted that there was nothing Baer's had done to cause the cessation of performance and that no change in circumstances had caused the cessation. (D.E.75-12, Runge Tr. 59:25–60:14.)   As Mr. Runge admitted, upon assuming his new position, he "revisited the dispute and made the decision that Comcast should never have agreed to make up the shortfall." (D.E. 75-12, Runge Tr. 59:04–23.)   Put simply, the undisputed record evidence establishes that Comcast unilaterally ceased to perform under the Shortfall Agreement when its new executive second-guessed the decision to enter into the agreement.   When asked about Comcast's unilateral termination of the agreement, Mr. Oberholtzer testified that, "*I would like to think I would have lived up to what I put down on paper*." (D.E. 64-22, Oberholtzer Tr. 126:22–127:16.)

### D.    Baer's Did Not Agree the Terms and Conditions Would Apply to East Coast Agreements.

There is no record evidence that Baer's executed the "Advertiser Terms and Conditions," which the District Court held applied to all of Baer's agreements with Comcast, including the Shortfall Agreement.   The only evidence offered by Comcast is that Baer's CEO executed a separate document – titled a "Certificate of Completion" – to which, Comcast argues without supporting evidence, the

Advertiser Terms and Conditions were attached.  (D.E. 61); (D.E. 60-1.)  Baer's
CEO testified that he had no recollection of signing the Certificate of Completion,
although he identified his electronic signature on it.  (D.E. 75-11, Baer Tr. 153:15–
17; 154:20–23; 155: 13–17.)

But even if the Terms and Conditions had been attached to the Certificate of
Completion, as Comcast contended, nowhere does the Certificate of Completion
refer to the Terms and Conditions.  (R. 60-1.)  And Mr. Baer's, whose signature
appears on the Certificate of Completion testified that he did not recall ever seeing
the "Advertiser Terms and Conditions" attached to that document. (D.E. 75-11, Baer
Tr. 153:18–156:20.)  Mr. Baer further testified that, even if the Advertiser Terms
and Conditions had, in fact, been attached to the Certificate of Completion, "I never
intended – nor did I understand – that by signing a cover sheet that specified that it
concerned 'Baer's Furniture Company Annual 2017 Agreement – WF' I was
agreeing to any terms that would govern my separate, future agreements with
Comcast concerning the non-West Florida markets." (D.E. 75-10 ¶ 4.)

The *only* document that the Advertiser Terms and Conditions refers to is
"Baer's Furniture Company Annual 2017 Agreement – WF."  (D.E. 60-1 at
COM000827.)  That is the agreement Baer's and Comcast entered into governing
the running of advertisements in West Florida for the year 2017. (D.E. 57-10, 4–5.)
When asked during his deposition, Mr. Baer testified that he signed the cover page

11

based on seeing his name on it, but did not recall ever seeing the "Advertiser Terms and Conditions" attached to the first page.  (D.E. 75-11, Baer Tr. 153:18–156:20.)

Geography aside, the Terms and Conditions provide that they apply only to advertisements run pursuant to "IOs" negotiated by Comcast and Baer's.  (D.E. 60-1.)  As noted above, Comcast has argued that "insertion orders" are annual schedules negotiated between Comcast and Baer's.  (D.E. 60 ¶ 9.)  The Shortfall Agreement is not an insertion order to a renegotiated annual agreement.  For starters, the Shortfall Agreement does not constitute – or even look like – a "schedule" such as the ones that were annually agreed to by Baer's and Comcast.  The Shortfall Agreement does not identify any "purchase" of advertising.  In addition, there is no "campaign start date(s) and end date(s)" or any specified "networks or distribution platforms on which the Ads [would] appear."  (D.E. 60-1); (D.E. 64-11.)  The Shortfall Agreement was a separate agreement which Comcast entered into to avoid being sued by Baer's and to retain Baer's business.  (D.E. 75-03, Elberg Tr. 173:20-174:01) (Elberg testifying that "we were in fix it mode," and "keeping in mind that he also spends a lot of money on the West Coast of Florida, and we didn't want to jeopardize those funds.")

## E.    District Court Proceedings and Disposition.

Baer's initially sued Comcast in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County (D.E. 1-3 at 9–21 (Case No. CACE-2020-

12575.))  Comcast removed the action to the Southern District of Florida on the basis of diversity jurisdiction (D.E. 1 ¶ 3) and Baer's filed its First Amended Complaint, asserting five breach of contract claims, three fraud in the inducement claims, and a claim for equitable accounting.  (D.E. 21.)

Comcast in turn moved to dismiss the First Amended Complaint.  (D.E. 23.) The District Court granted in part and denied in part, dismissing Baer's fraudulent inducement and equitable accounting claims without prejudice.  (D.E. 35.)  Baer's then filed its Second Amended Complaint ("SAC"), asserting the following eight claims (D.E. 38) against Comcast: Count I: Breach of the 2017 Miami/Ft. Lauderdale DMA Agreement; Count II: Breach of the 2018 Miami/Ft. Lauderdale DMA Agreement; Count III: Breach of the 2017 West Palm Beach DMA Agreement; Count IV: Breach of the 2018 West Palm Beach DMA Agreement; Count V: Breach of the Shortfall Agreement; Count VI: Fraud in the Inducement for the Miami/Ft. Lauderdale and West Palm Beach Agreements; Count VII: Fraud in the Inducement for the Shortfall Agreement; and Count VIII: Fraud in the Inducement for the Sarasota Agreement.

Comcast moved to dismiss the SAC (D.E. 41), which the District Court denied as moot in light of pending summary judgment motions by both parties.  (D.E. 73.) Comcast filed its motion for summary judgment, seeking judgment in its favor on all claims in the SAC.  (D.E. 61.) Baer's in turn moved for summary judgment in its

favor on Count V alone.  (D.E. 65.)  The District Court ruled in favor of Comcast on all counts and against Baer's on Count V.  (D.E. 94.)

As is pertinent to this appeal, the District Court found that (1) the Advertiser Terms and Conditions applied to the Shortfall Agreement and, thus, that all of Baer's claims, including for breach of the Shortfall Agreement, were barred by the shortened limitations period provided in the Advertiser Terms and Conditions, (2) that, in any event, the Shortfall Agreement failed for lack of consideration, and (3) that the fraudulent inducement claims were precluded by the independent tort doctrine.  (D.E. 94.)

The District Court entered final judgment in favor of Comcast on June 23, 2022 (D.E. 95.)

### F.    Standard of Review.

The Court "review[s] a grant of summary judgment de novo, applying the same legal standards used by the district court."  *Peterbrooke Franchising of America, LLC v. Miami Chocolates, LLC*, 2022 WL 6635136, at *3 (11th Cir. 2022) (internal quotation and citation omitted).  This *de novo* standard applies to a district court's interpretation of a contract.  *Evanston Ins. Co. v. Sandersville Railroad Co*., 761 Fed.App'x. 940, 942 (11th Cir. 2019). That means that, upon review, this Court "draw[s] all fact and inferences in the light most favorable to the nonmoving party."  *Id*. (internal quotation and citation omitted); *see also Wilson v Flack*, 2022 WL

4477025, at *4 (11th Cir. September 27, 2022) ("In conducting our review, we resolve any factual disputes and draw all evidentiary inferences in favor of" the nonmoving party). A grant of summary judgment is affirmed "only where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Peterbrooke*, 2022 WL 6635136 at *3 (internal quotation and citation omitted).

## SUMMARY OF THE ARGUMENT

There is a genuine dispute as to whether the Advertiser Terms and Conditions were executed by Baer's and, if so, whether they apply only to Baer's West Florida Contracts or, as the district court improperly found on summary judgment, to all of the agreements between Baer's and Comcast. There is no record evidence that Baer's agreed to the Advertiser Terms and Conditions. Moreover, even had Baer's agreed, as Comcast contends, there is a latent ambiguity as to whether the agreement applied to the East Florida and Shortfall Agreements. The district court erred in granting summary judgment on these issues.

The district court also erred when it ruled that the Shortfall Agreement lacked consideration. The record shows that Comcast agreed to be bound by the Shortfall Agreement in exchange for Baer's foregoing legal action, which constituted consideration. Both Comcast's and Baer's executives testified to this fact. Further, the record shows that Comcast agreed to be bound by the Shortfall Agreement, both

in written communications and in its repeated conduct up to the point that Comcast's new management decided to terminate the agreement.

Lastly, Baer's fraud claims are separate and independent of its contract claims. Baer's fraud claims are based upon Comcast's pre-contract misrepresentations that induced Baer's to enter into agreements with Comcast. In fact, Comcast has taken the position that the agreements did not require any performance relative ratings points and its executives admitted that Comcast provided ratings information to Baer's so it could decide which spots to purchase. That is the quintessential independent tort of fraud in the inducement.

## **ARGUMENT**

## I.   **THE WEST FLORIDA TERMS AND CONDITIONS DID NOT GOVERN THE PARTIES' WEST PALM BEACH AND MIAMI/FORT LAUDERDALE AGREEMENTS.**

### A.    **There Is No Evidence In The Record That Baer's Agreed To The "Advertiser Terms and Conditions."**

The District Court found that "[o]n November 11, 2016, Jerry Baer, President of Baer's, signed a document titled 'Advertiser Terms and Conditions' on behalf of Baer's." (D.E. 94 at 2.)  However, whether Baer's ever signed that document is a disputed issue of fact that cannot be resolved on summary judgment.

It is undisputed that Mr. Baer's signature does not appear anywhere on the Advertiser Terms and Conditions. (D.E. 60-1.)  The *only* record evidence as to Mr. Baer's signature is that it appears on a separate document: the Certificate of

16

Completion.  (*Id.*)  But there is no evidence that, when Mr. Baer signed the Certificate of Completion, attached to that document was the document titled Advertiser Terms and Conditions.  (*Id.*)  In fact, Mr. Baer did not recall ever seeing either the Certificate of Completion or the Advertiser Terms and Conditions, much less having signed them.  (D.E. 75-10 ¶¶ 4-5.)  Nor is there any indication on the face of the Certificate of Completion that the Advertiser Terms and Conditions was appended to it or incorporated by it.  Rather, in its "re" line, the Certificate of Completion makes clear it relates only to another document: "RE: BAER'S FURNITURE COMPANY ANNUAL 2017 AGREEMENT-WF." (D.E. 60-1.)  It bears no mention of, or reference to, any "Advertiser Terms and Conditions."

Instead, there is only Comcast's unsupported assertion that the Advertiser Terms and Conditions were appended to the Certificate of Completion purportedly signed by Mr. Baer.  In its motion for summary judgment, Comcast simply treated both documents as one, conveniently terming them "Terms and Conditions" and asserting – without any evidentiary support – that if Mr. Baer executed the Certificate of Completion, he also agreed to the Advertiser Terms and Conditions.  (D.E. 61 at 3.)  However, while Baer's does not dispute that Mr. Baer signed the Certificate of Completion it does dispute that, in doing so, he also signed or assented to the separate Advertiser Terms and Conditions.

    **B.**    **There Is A Disputed Issue of Fact As To Whether the Advertiser Terms and Conditions – Even If Agreed To – Were Intended To**

**Apply To Either The East Florida Agreements or the Shortfall Agreement.**

In addition to ruling that Baer's CEO signed the "Advertiser Terms and Conditions" on November 11, 2016, the district court improperly passed on another disputed issue of fact when it ruled that "the Terms and Conditions apply to the parties' entire contractual relationship," including the Shortfall Agreement. (DE 94 at 10.) The district court made that ruling after finding that the introductory paragraph of the Advertiser Terms and Conditions "provide[s] that they govern the parties' schedules." (*Id*.)

The district court reached that conclusion after finding that the paragraph "unambiguously govern[s] the parties' entire advertising relationship." (*Id*.) Accordingly, the district court determined it "need not consider Baer's arguments based on parole evidence for limiting the application of the Terms and Conditions to the West Florida markets." (*Id*.) If, as Comcast contends (and the district court accepted), the Certificate of Completion and the Advertiser Terms and Conditions are one document, the district court erred in myopically limiting its "ambiguity" review to the first paragraph of the Advertiser Terms and Conditions, while refusing to consider the Certificate of Completion. *All Seasons Condominium Assoc. Inc. v. Patrician  Hotel, LLC*, 274 So.3d 438, 448 (Fla. 3d DCA 2019). As noted in *All Seasons*, in determining whether a contract is ambiguous, the court must look at the "entire contract" and not to an "isolated" provision. *Id*. at 448.

18

"Where the terms of the written instrument are disputed and reasonably susceptible to more than one construction, an issue of fact is presented as to the parties' intent which cannot properly be resolved by summary judgment." *Cypress Prop., LLC v. JP Morgan Chase Bank N.A.*, 21-11989, 2022 WL 950941, at *5 (11th Cir. Mar. 30, 2022) (quoting *Strama v. Union Fid. Life Ins. Co.*, 793 So. 2d 1129, 1132 (Fla. 1st DCA 2001) (vacating summary judgment and remanding to consider and make factual findings about extrinsic evidence of parties' intent); *Mac-Gray Servs., Inc. v. Savannah Assocs. of Sarasota, LLC*, 915 So. 2d 657, 659 (2d DCA 2005) ("Where there is a latent ambiguity affecting a disputed contract provision, there necessarily will be a disputed issue of material fact.")

In ending its analysis with its decision that the first paragraph of the Advertiser Terms and Conditions contained no ambiguity, the district court erroneously overlooked the fact that the circumstances concerning the Certificate of Completion and Advertiser Terms and Conditions created a latent ambiguity properly resolved by looking at extrinsic evidence to determine the intent of the parties – an inquiry in which the district court could not engage on summary judgment. A latent ambiguity exists when a contract's language is clear, but some extrinsic fact or extraneous evidence creates a need for interpretation or a choice between two or more possible meanings." *Riera v Riera*, 86 So.3d 1163, 1166 (Fla. 3d DCA 2012) (internal quotation and citation omitted).

"Where a contract contains a latent ambiguity, the trial court must hear parole evidence to interpret the writing correctly." *Id.* at 1163 (internal quotation and citation omitted); *see also Levitan v. Dancaescu*, 2022 WL 4229388, at *2 (Fla. 1st DCA 2022) (reversing summary judgment). And where a written agreement contains conflicting provisions (here, the Confirmation of Completion's reference to the 2017 West Florida agreement and the Advertiser Terms and Conditions' purported application to all agreements), "the better rule…is to allow extrinsic evidence of the parties' intent." *Hurt v. Leatherby Ins. Co*., 380 So.2d 432, 432 (Fla. 1980).

Looking at the Confirmation of Completion and the Advertiser Terms and Conditions as one – just as Comcast and the district court did when referring to them simply as one document (the "Terms and Conditions") – an ambiguity exists as to whether the Advertiser Terms and Conditions were intended to apply to a contract other than the West Florida 2017 agreement, or to that agreement and future West Florida agreements.

Put another way, the ambiguity cannot be identified merely by looking at the language of the opening paragraph of the Advertiser Terms and Conditions that it will apply to "one or more insertion orders (each an 'IO') that the parties may negotiate from time-to-time," (D.E. 60-1), when the first page of the document states that the document relates to the 2017 West Florida agreement. (*Id.*) The reference

20

on the cover sheet to the West Florida region renders ambiguous whether the reference in the Advertiser Terms and Conditions to future insertion orders included insertion orders for the East Florida region, which were not the subject of discussion or negotiation when the Certificate of Completion was signed.

The district court was thus required to consider extrinsic evidence with respect to the parties' intent.  In addition to the reference to "the Annual 2017 Agreement-WF," the document is apparently signed on behalf of Comcast by Fran Perpich. Perpich was the Comcast West Florida account executive who oversaw Baer's 2017 annual agreement for Fort Meyers and Naples. Laura Brandano, Comcast's Director of Sales and General Manager for West Florida (D.E. 75-1, Brandano Tr. 22:12-21), confirmed that Perpich, who worked under her, was "a regional account executive" who "handled our mid-to-large size clients that brought on a local level in Southwest Florida."  (D.E. 75-1, Brandano Tr. 41:03-15.)  Perpich testified that she was a "regional account executive" for "Fort Meyers" (D.E. 75-2, Perpich Tr. 68:07-09) and the scope and limit of her responsibilities was "selling in our market, our DMA, as we call it."  (D.E. 75-2, Perpich Tr. 33:07-13.)  Perpich testified that the Annual 2017 Agreement-WF was a part of the "schedules /agreements for Fort Meyers and Naples."  (D.E. 75-2, Perpich Tr. 98:08-99:24.)  At bottom, the district court's finding that the introductory paragraph of the Advertiser Terms and Conditions was

unambiguous improperly ignored the fact that there was ambiguity as to whether the Advertiser Terms and Conditions were to apply outside of West Florida.

### C.    There Was No Meeting Of The Minds To Establish The 2017 West Florida Terms And Conditions Were Intended To Govern The East Florida Agreements.

"[A] contract containing ambiguous material terms is unenforceable because the parties never reached a meeting of the minds regarding an essential term of the agreement." *Aldora Aluminum & Glass Products, Inc. v. Poma Glass & Specialty Windows, Inc.*, 683 Fed. Appx. 764, 768 (11th Cir. 2017) (internal quotations omitted) (alteration) (quoting *King v. Bray*, 867 So.2d 1224, 1227 (Fla. 5th DCA 2004)). Accordingly, "[w]hen essential terms are left open for negotiation, there is no meeting of the minds." *Bus. Specialists, Inc. v. Land & Sea Petroleum, Inc.*, 25 So. 3d 693, 695 (4th DCA 2010) (alteration); *Nichols v. Hartford Ins. Co. of the Midwest*, 834 So. 2d 217, 219 (1st DCA 2002) (finding no meeting of the minds where essential term of agreement ambiguous rendering agreement unenforceable.)

Here, the record indicates that Baer's never agreed to the terms and conditions and never intended for the purported terms and conditions to apply globally to all of Baer's annual advertisement agreements with Comcast:

> Although I have no specific recollection of signing the cover sheet to the "Terms and Conditions," I never intended – nor did I understand – that by signing a cover sheet that specified that it concerned "Baer's Furniture Company Annual 2017 Agreement – WF" I was agreeing to any terms that would govern my separate, future agreements with Comcast concerning the non-West Florida markets. In fact, even today,

22

> in reading the seven single-spaced "Terms and Conditions," I do not believe that they concern or relate to the non-West Florida contracts that are the subject of this lawsuit.

(D.E. 75-10 ¶ 5.)  Though the purported "terms and conditions" may be linked to West Florida advertisement agreements, the record does not support the court's determination that the parties set any parameters for what might constitute the "full terms and conditions already on file" is actually referring to.  The record reveals the parties did not even discuss the concept of a globally applied set of "terms and conditions" to govern every contract between the parties and conclusively establishes the parties did not "mutual[ly] assent to a certain and definite proposition" as required by Florida law.  *Aldora Aluminum & Glass Products, Inc. v. Poma Glass & Specialty Windows, Inc.*, 683 Fed. Appx. 764, 768 (11th Cir. 2017) (citing *ABC Liquors, Inc. v. Centimark Corp*., 967 So.2d 1053, 1056 (Fla. 5th DCA 2007.))

### D.     The Extrinsic Evidence the District Court Did Consider Supports Baer's, And Undermined Comcast's Assertions.

Although the district court refused to consider Baer's extrinsic evidence, it considered other extrinsic evidence concerning the parties' intent with respect to the application of the Advertiser Terms and Condition.  The court, however, misconstrued that evidence, which actually supports Baer's.

The district court supported its determination that the Advertiser Terms and Conditions applied to East Florida agreements because "***some*** of the schedules

explicitly reference and incorporate 'terms and conditions' already on file." (D.E. 94 at 3.)  Neither of these documents support the court's conclusion.

One of the two schedules the District Court relied on concerned West Florida (and, specifically, the city of Sarasota), which is consistent with the purported terms and conditions applying only to West Florida:



(D.E. 60-9.)

The other document the court relied on was an unsigned draft schedule concerning West Palm Beach.  That document bears no markings that show it was "approved" or signed by anyone at Baer's:

(D.E. 60-5 at BF0000456–57.)  Yet, the ***actual, approved schedule*** for West Palm

Beach excluded the reference to the "terms and conditions on file," upon which the

district court relied:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| This report has been prepared using STRATA NuMath research. | | | | | | | |
| STRATA NuMath and report designs Copyright ©2016 Strata Marketing, Inc. 312-222-1555 | | | | | | | |
| Nielsen Audience Estimates Copyright ©2016 The Nielsen Company, used under license, all rights reserved | | | | | | | |
| Adjustments: Network Insertability and Network Carriage have been factored into calculations. | | | | | | | |
| West Palm Beach-Boca Raton 3BK Jul15+Nov15+Feb16 DMA Nielsen Live+7 | | | | | | | |
| Cable Zones: Comcast, Palm Beach Interconnect | | | | | | | |
| ◼ = Estimate information indicated has been supplied by the user. | | | | | | | |

(D.E. 60-7 at COM001362–63.) This evidence wholly undercuts the notion that the Advertiser Terms and Conditions applied to the East Florida agreements, and, at the very least, creates a genuine issue of material fact.

The district court's reliance on this evidence is puzzling because Baer's raised this contention before the district court in its response in opposition to Comcast's summary judgment motion: "[i]ndeed, the only schedule upon which Baer's sues that even references 'terms and conditions' is the one for West Palm Beach for 2017. It provides that: '[b]y signing this contract, I agree to the full terms and conditions already on file.' (D.E. 60-5.) Although this sentence is vague in failing to specify which terms and conditions were 'on file,' Baer's did not sign the schedule." (D.E. 74 at n.1.)

Whether, even if deemed signed by Baer's, the Advertiser Terms and Conditions were intended to apply to East Florida agreements presented a genuine issue of material fact not subject to resolution by summary judgment.

26

E.     **Even If the Advertiser Terms And Conditions Governed The Schedules/Insertion Orders, They Did Not Govern The Shortfall Agreement.**

The district court's finding that the Shortfall Agreement was also subject to the Advertiser Terms and Conditions was erroneous for the further reason that the Shortfall Agreement was not an Insertion Order.

The district court found that Comcast was entitled to summary judgment as to the Shortfall Agreement because it did not "comport with the modification clause in the Terms and Conditions." (D.E. 94 at 10.) This ruling was predicated on the erroneous finding that the Shortfall Agreement is an IO even subject to the Advertiser Terms and Conditions.

As the district court found, the Advertiser Terms and Conditions apply to IOs, which are the same thing as "schedules." (D.E. 94 at 10.) The Shortfall Agreement is not an IO or a schedule. It was a wholly different and separate agreement to resolve a dispute between Baer's and Comcast. The very definition of IO in the Terms and Conditions requires that it specify rates, types of inventory, and networks on which the ads were to appear. (D.E. 60-1.) The Shortfall Agreement, evidenced by emails and conversations between Baer's and Comcast, does not meet the criteria and was not an IO or schedule. That much is apparent from actual IOs/schedules to which Baer's and Comcast agreed. The Shortfall Agreement is an independent

27

agreement that stands on its own and is subject to the Advertiser Terms and Conditions.[4]

## II.    BAER'S FORBEARANCE OF LEGAL ACTION WAS SUFFICIENT CONSIDERATION TO RENDER THE SHORTFALL AGREEMENT ENFORCEABLE.

### A.    There is a Genuine Issue of Disputed Material Fact as to Whether Baer's Forgoing Legal Action and Continuing To Do Business With Comcast Was Consideration For Comcast's Performance Under The Shortfall Agreement.

It is well-settled that "a promise, ***no matter how slight***, can constitute sufficient consideration so long as a party ***agrees to do something*** that they are not bound to do." *Delta Health Group Inc. v. Royal Surplus Lines Ins. Co.*, 327 Fed. Appx. 860, 866 (11th Cir. 2009) (quoting *Ashby v. Ashby*, 651 So.2d 246, 247 (Fla. 4th DCA 1995)) (emphasis added).  This is because "consideration is only required to rise to the level of a peppercorn." *Id.*  Further, courts have consistently held that to forbear pursuing legal action related to a claim is "sufficient consideration" to make a contract enforceable. *Crystal Colony Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 6 F. Supp. 3d 1295, 1299 (S.D. Fla. 2014) (citing *Delta Health Group Inc.*, 327 Fed. App'x. at 866 (alteration)). Accordingly, "[c]onsideration is supplied when

---

[4] Having found that the Shortfall Agreement was governed by the Advertiser Terms and Conditions, the district court ruled that that it was not enforceable because it "necessarily would constitute a modification of the Terms and Conditions."  (D.E. 94 at 19.)  Just how the Shortfall Agreement "modified" the Advertiser Terms and Conditions was not explained by the district court.

the circumstances are such that ***it is reasonable to infer*** that forbearance was desired and sought by the promisor and forbearance by the promisee follows." *Boymer v. Birmelin*, 227 So.2d 358, 362 (Fla. 3d D.C.A. 1969), *cert denied*, 400 U.S. 962 (1970); *Egyptian Nav. Co. v. Uiterwyk*, 83-334 CIV-T-10, 1988 WL 70047, at *3 (M.D. Fla. Jan. 7, 1988) (finding forbearance of legal action and success in salvaging a continued business relationship established consideration) (emphasis added).

### B.    The Record Shows That Baer's Forewent Legal Action As Consideration For The Shortfall Agreement.

Witnesses for Comcast and Baer's testified that the Shortfall Agreement was consideration for Baer's not seeking legal action against Comcast. Comcast CEO Jerry Baer declared under oath that "when Comcast admitted it breached the 2017 and 2018 agreements for the Miami/Ft. Lauderdale and West Palm Beach DMAs, I threatened to sue Comcast for the breach.  In response, Comcast offered to run advertising at no cost to Baer's to 'make up' for what it called its 'shortfall' in delivering ratings points in 2017 and 2018."  (D.E. 75-10 ¶ 7.)  Comcast witness, Michael Elberg, testified similarly, "[h]e [Baer's CEO] threatened legal action if we don't do as he wishes."  (D.E. 75-03, Elberg Tr. 173:02-174:01.)  Further, when asked, "notwithstanding what you feel about the Nielsen data, the fact is that ***there was a number presented to Mr. Baer's [sic] by Comcast and Mr. Baer agreed to it***, and that was the number that – a points shortfall that was going to be made up

29

through free posts, or I should say, spots, correct?"  Mr. Oberholtzer, "*I agree with that*.  Correct."  (D.E. 64-22, Oberholtzer Tr. 102:16–23.)

Based on these three separate pieces of evidence, it is more than reasonable to infer, at least sufficient to create a genuine issue of disputed fact, that legal action was being forborne in consideration for Comcast's promise to make up for its shortcomings.

### C.    Comcast Repeatedly Promised To Perform And Expressed Its Intent To Be Bound By The Shortfall Agreement.

"Even assuming a lack of mutuality of obligation at the inception of the contract, 'such defect may be cured by the subsequent conduct of the parties'" and "less-than-full or substantial performance [is] sufficient to cure a lack of mutuality of obligation in appropriate circumstances."  *Flagship Resort Dev. Corp. v. Interval Intern., Inc.*, 28 So. 3d 915, 922 (Fla. 3d DCA 2010) (quoting *Wright & Seaton*, *Inc. v. Prescott*, 420 So.2d 623, 627 (Fla. 4th DCA 1982); *see also* Restatement (Second) of Contracts § 19 (1981) ("Conduct may often convey as clearly as words a promise or an assent to a proposed promise.")

The record shows that Comcast repeatedly conveyed its promise to perform under the Shortfall Agreement. Over the course of approximately one year, through numerous emails from its executives, Comcast affirmatively promised as follows:

- "WPB *will be treated* just like Miami…*just like the business was ordered*. The WPB number is 11,341." (D.E.64-4);

- "Both markets *are being handled in the exact same way*." (D.E. 64-4);

- "As discussed, *we are moving forward with our plan* to make up points for Baer's from 2018…*Once we make up this difference*, we can look at future schedules." (D.E.64-10);

- "Just to summarize our meeting yesterday, *we will be implementing the following plan*: In 2019 *we will run* UD schedules in WPB and MIA are coordinated with your advertising flight weeks," and that "[a]djustments to the schedule(s) *will be made to ensure performance*." (D.E. 64-11);

- "One certainly is that *I will be here to ensure that the plan is implemented*." (D.E. 64-12);

- "Starting in April (when the new guidelines kick in), *we will be coding your spots as 'VIP'* so that they have a much greater chance of clearing the networks you covet, thus garnering you higher ratings and help us *get to a zero sum total much faster*." (D.E. 64-13.)

Similarly, the record shows that Comcast executives affirmed over the course of a year their intent to be held accountable to the Shortfall Agreement:

- "We look forward *making good on our shortfall*." (D.E. 64-3);

- "A makegood schedule for WPB *delivered* 546 grps in January (D.E. 64-4);

- "Last week when we met you requested the final tally. *Please find both 2018 and 2017 in one PDF*. (D.E.64-5);

- "*Attached, please find Q1 to date*. *Todd [Weissman] has approved changes moving forward to help with clearance*. We should begin to see that impact in April." (D.E. 64-7);

- "Please note that *the point's owed totals will adjust as the rest of 2018 posts out*." (D.E. 64-10.)

31

The record also shows that Comcast's conduct conveyed its promise and assent to its proposed promise to perform under the Shortfall Agreement. Week after week and month after month, Comcast executives provided regular updates to the number of gross ratings points that it performed under the Shortfall Agreement. (D.E. 64 ¶ 14–27.)  Even if there were such lack of mutuality of obligation at the inception of the Shortfall Agreement (there was not), the record establishes that Comcast's subsequent and consistent conduct over the course of approximately nine months cured any such defect.  *Flagship Resort Dev. Corp. v. Interval Intern., Inc.*, 28 So. 3d 915, 922 (Fla. 3d DCA 2010) (quoting *Wright & Seaton, Inc. v. Prescott*, 420 So.2d 623, 627 (Fla. 4th DCA 1982).

## III.    BAER'S FRAUDULENT INDUCEMENT CLAIMS WERE SEPARATE AND DISTINCT FROM ITS BREACH OF CONTRACT CLAIMS.

That a fraudulent inducement claim must be independent of a breach of contract claim is a "minimal requirement."  *Glob. Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1031 (11th Cir. 2017).  Generally, pre-contractual misrepresentations are grounds for independent torts where, on the other hand, misrepresentations related to the breaching party's contract performance are not. *CMR Constr. & Roofing LLC v. Orchards Condo. Ass'n, Inc.*, 220CV422FTM29MRM, 2020 WL 6273740, at *3 (M.D. Fla. Oct. 26, 2020) (citing

*Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1223 (11th Cir. 2018).

The record shows that Baer's fraud allegations concern Comcast's misrepresentations about Nielsen Audience estimate gross ratings points, which induced Baer's to enter into and pay for annual advertisement programming in 2017 and 2018. The record shows that Baer's fraud allegations have nothing to do with Comcast's actual contract performance. Through those misrepresentations, Comcast induced Baer's to enter into annual contracts by misrepresenting that Comcast advertisement pricing was based on third-party audience ratings estimates from the Nielsen Company and by making representations about those ratings.

Baer's fraud allegations are not interwoven and indistinct from the heart of Baer's breach of contract allegations because in its fraud claims Baer's asserts that Comcast induced Baer's to enter annual agreements based on its misrepresentations concerning Nielsen ratings for the schedules Comcast proposed to Baer's. Comcast's own representatives – while denying that the agreements were "points-based" and, thus, did not obligate Comcast to meet any ratings target – testified that the ratings points were provided to Baer's so that it could take them into account in deciding which advertising slots to purchase.  (D.E. 64-22, Oberhotzer Tr. 41:09–42:19); (D.E. 75-12, Runge Tr. 30:3-6; 31:7-36:10; 42:17-20.)  The district court

erred in finding that Baer's fraudulent inducement claim is precluded by the independent tort doctrine.

## CONCLUSION

For the foregoing reasons, this Court should vacate the default final judgment and remand the case with instructions that a new judgment be entered eliminating or reducing the award of incidental damages in an amount consistent with this Court's decision.

Dated: October 12, 2022

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By:  */s/ Carlos M. Sires*
      Carlos M. Sires, Esq.
      (Fla. Bar No. 319333)
      Corey P. Gray, Esq., LTC USAR
      Florida Bar No.: 0115473
      401 East Las Olas Blvd., Suite 1200
      Fort Lauderdale, FL  33301
      Telephone:  (954) 356-0011
      Facsimile:  (954) 356-0022

      csires@bsfllp.com
      cgray@bsfllp.com

      *Attorneys for Baer's Furniture, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this brief complies with the type-volume limitation as set forth in Fed. R. App. P. 32(a)(5)–(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it has been prepared in a proportionally spaced typeface using Times New Roman style in 14-point font and contains 7,405 out of the 13,000 words prescribed therein according to Microsoft Word for Office 365.

By:  */s/Carlos M. Sires*
Carlos M. Sires, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 12, 2022, I electronically filed the foregoing using the Court's Appellate PACER system, which will automatically send notification to the following counsel of record for Defendant/Appellee:

| | |
|---|---|
| Raul J. Cosio, Esq. | raul.cosio@hklaw.com |
| Anna Marie Gamez, Esq. | annie.hernandezgamez@hklaw.com |
| Rebecca M. Plasencia, Esq. | rebecca.plasencia@hklaw.com |

By:  */s/Carlos M. Sires*
     Carlos M. Sires, Esq.

36